STATE OF CONNECTICUT *v.* RICHARD SALZ
(14531)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and KATZ, Js.

---

Argued January 7—decision released June 22, 1993

*Todd D. Fernow,* for the appellant (defendant).

*Rita M. Shair,* assistant state's attorney, with whom was *Michael Dearington,* state's attorney, for the appellee (state).

CALLAHAN, J. In this certified appeal, the sole issue[1] is whether there was sufficient evidence of the defend-

---

[1] Although we did not certify an issue concerning improper jury instructions, we address the concerns raised in the dissenting opinion. Both criminal negligence and recklessness require instructions on what constitutes a "substantial and unjustifiable risk." See General Statutes § 53a-3 (13) and (14). For both offenses, the risk that the defendant either perceived and disregarded (reckless) or failed to perceive (negligence) must be of such nature and degree that it constitutes a gross deviation from the standard of care

ant's awareness of and conscious disregard of a substantial and unjustifiable risk that death would result from his conduct to support his conviction of manslaughter in the second degree. The defendant, Richard Salz, was charged in a single count amended information with manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1).[2] Following the defendant's conviction by a jury, the trial court sentenced him to a term of imprisonment of ten years, execution suspended after five years. The defendant appealed to the Appellate Court, which affirmed the trial court's judgment. *State* v. *Salz,* 26 Conn. App. 448, 602 A.2d 594 (1992). We granted the defendant's petition for certification to appeal to this court.[3] We affirm the judgment of the Appellate Court.

that a reasonable person would observe in the situation. In this case, the trial court failed to describe the risk in its initial charge and did so later solely in response to the jury's request for a rereading of the statutory definition of recklessness. The charge would arguably have been deficient if the trial court had not instructed on the severity of the risk that the defendant was accused of having consciously disregarded.

Although the trial court in its recharge devoted much time to defining this risk, such definition was not given in a vacuum. The word "recklessly" or "recklessness" was used nine times in the recharge. The defendant excepted to the recharge because, he claimed, it suggested the standard of care applicable to ordinary negligence, as opposed to the "gross deviation" required by § 53a-3 (13). This exception was unfounded. The trial court cautioned the jury three times that the risk had to be *so* great that disregarding it was a gross deviation from the standard of conduct that a reasonable person would have observed in that situation and, furthermore, defined "gross deviation."

While we agree with the dissent that an examination of an issue we declined to certify may be warranted in certain cases; *Nardini* v. *Manson,* 207 Conn. 118, 120 n.1, 540 A.2d 59 (1988); that does not apply to this case.

[2] General Statutes § 53a-56 provides in relevant part: "(a) A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

[3] We granted certification for appeal from the Appellate Court, *State* v. *Salz,* 26 Conn. App. 448, 602 A.2d 594 (1992), limited to the following issue: "Was there sufficient evidence to support the defendant's conviction of manslaughter in the second degree?" *State* v. *Salz,* 222 Conn. 901, 606 A.2d 1327 (1992).

The Appellate Court set forth the relevant facts that the jury could reasonably have found. "The defendant, a licensed electrician with thirty-one years experience, was asked to rewire his neighbor's kitchen. The neighbor agreed to pay the defendant $1200 for his services. The defendant was, among other things, to provide and install two baseboard heaters, one in the kitchen and the other in the basement. The defendant began the job in September of 1988, returning on three or four occasions over the next month to complete the job. On November 8, 1988, on his last visit, he installed the basement heater and connected it to the circuit breaker box and was paid $1000 for his services to date. The job was not yet completed and the neighbor expected the defendant to return to complete it. The defendant told his neighbor that both heaters he installed were operable.

"The neighbor first used the basement heater for only one hour shortly before Christmas. On December 28, the basement heater was left on during the night. At about 1 a.m., the neighbor awoke and smelled smoke. He then discovered that there was a fire on the basement rug coming from the back of the heater installed by the defendant. Believing the fire was small, he initially went to the kitchen to get water to attempt to put out the fire himself. Upon his return, the basement was engulfed with flames. He then proceeded to the second floor to get his wife and two grandchildren out of the home. The neighbor, his wife and one of his grandchildren were all able to escape the fire, while one child remained in the home. Attempts to reenter the home were unsuccessful because the fire had spread to the second floor. Firefighters from the town of East Haven were unable to save the child. An autopsy revealed that the cause of the child's death was carbon monoxide inhalation.

"At trial, the state presented several witnesses who testified about the cause of the fire and the fire code's requirements concerning electrical work. Frederick Brow, fire marshal of the town of East Haven, arrived at the scene of the fire at approximately 2 a.m. On the basis of his investigation, Brow concluded that the electric heater in the basement malfunctioned and caused the fire. Brow did not find any trace of an accelerant that would have caused a fire. He thus ruled out arson. There was also no evidence of cigarette smoking in the house or any type of damage indicating that the cause of the fire was a lit cigarette. Brow was unable to locate the remains of a lock nut on the cable connecting the heater to the circuit box. Upon learning that the defendant performed the electrical work, Brow tried to inspect the defendant's warehouse which contained his electrical supplies but was denied entry by the defendant. The defendant admitted that the heaters he installed were from his warehouse.

"The state also called the assistant state building inspector, Lawrence Acquarulo, an electrical inspector, to testify as an expert witness. Acquarulo is responsible for inspecting all electrical installations to ensure that they comply with the national electrical code. He testified that Connecticut law requires compliance with the national code, a set of minimum electrical requirements. Acquarulo noted that the defendant had been issued an inspector's license from the state of Connecticut and in the past had been the electrical inspector for the town of Wallingford. Acquarulo's investigation of the fire scene revealed several violations of the code that could have resulted in the heater's ignition.

"Acquarulo stated that the defendant installed the basement heater beneath an electrical outlet. He felt that this location was in violation of the heater manufacturers' instructions. Acquarulo further testified that the basement heater was clearly stamped as being a

120 volt unit, yet it was wired to a 240 volt circuit. According to his testimony, a 120 volt heater generally has two wires completing the circuit. One wire is connected to the electrical wire through a circuit breaker and the other wire is connected to a ground or neutral terminal in the junction box. In this case, both wires had been spliced to power producing lines on the circuit breakers instead of having just one wire connected through a circuit breaker. Thus, 240 volts were brought to the heater.

"Acquarulo further testified that the BX cable used to connect the heater to the circuit breaker was not secured with a lock nut. A lock nut fastens the metal clamps connecting the metal sheath encircling the electrical wire to the heater. The installation of the lock nut creates a grounding condition known as bonding which could have prevented a fire when the overheating occurred. The circuit breaker operates to terminate the electrical current if an excessive amount of current is being transmitted to a heater. There was also testimony that the heater's internal thermostat did not function properly. A working thermostat would have automatically turned the heater off once it began to overheat.

"Other violations of the national code that Acquarulo noticed included the absence of a bar on the handle connecting the two circuit breakers. This bar enables both circuit breakers to trip whenever one breaker registers a fault. The installation of a bar is required if the wiring includes 240 volts. Another violation was the multiple splices of the wire through the circuit breaker panel. Acquarulo concluded his testimony by noting that many of these violations were uncommon and that he had never witnessed this many violations at one site.

"Thomas Haynes also testified as an expert witness to the findings of his separate investigation of this fire.

He agreed with Brow that the heater caused the fire
and with Acquarulo concerning the many violations of
the national electrical code by the defendant. He fur-
ther testified about the thermal cutout discs in the
heater. Thermal cutout discs are factory installed heat
activated switches that trip and shut off power when
an appliance overheats. According to Haynes' investi-
gation, because the heater was improperly wired, the
thermal discs failed to operate properly. Haynes testi-
fied that the defendant's failure to get a permit from
the town building department also violated the state
electrical code.

"The defendant was the sole witness to testify for
the defense. He first noted that he did the electrical
work for his neighbor as a favor and that he received
no profit from the job. He spoke of his extensive expe-
rience as an electrician, noting that he had installed
and wired 'tens of thousands of electrical baseboard
heaters.' He maintained that he correctly wired the
heater on a 120 volt circuit rather than on a 240 volt
circuit. He was sure of this because he remembered
testing the heater twice after his installation. It was
his testimony that if he had incorrectly wired the heater
to a 240 volt circuit, the heater would immediately
become very hot and make a humming noise. Because
this did not occur, he concluded that the heater was
installed properly. The defendant also disputed the evi-
dence about the absence of a lock nut, claiming that
he had installed a lock nut on the heater. He also denied
having made any of the splices that were observed by
Acquarulo.

"The defendant further asserted he had installed a
'piggyback' circuit breaker to accommodate both
heaters because the circuit panel was full. The circuit
breaker box was admitted into evidence, however, and
the piggyback breaker was not attached to it. The
defendant claimed that someone must have tampered

with his installation of the heater. The defendant acknowledged that the installed heaters were purchased at an auction at a substantial discount. He first testified that all the heaters he bought were new and in their original cartons. When evidence presented by the state indicated that the heaters had been previously used, he later admitted that not all the heaters were new. The defendant denied ever preventing Brow from inspecting his warehouse. The defendant claimed that he believed that [the] homeowner was required to obtain the permit for the electrical work. He warned his neighbor that if the neighbor did not get a permit, the neighbor would be assuming full responsibility for the work." *State* v. *Salz,* supra, 449–53.

In this court, the defendant concedes that: (1) there was sufficient evidence for the jury reasonably to have concluded that he had violated several provisions of the national electrical code when he performed electrical work in his neighbor's home; and (2) his improper wiring of the 120 volt heater to a 240 volt circuit was the substantial factor in causing the fire and was, therefore, the legal cause of the victim's death.[4] See *State* v. *Spates,* 176 Conn. 227, 234–35, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979).

The defendant claims, however, that his conduct, although constituting incompetent, sloppy, or even gross workmanship, warranted at most a conviction of criminally negligent homicide rather than reckless manslaughter in the second degree. The defendant argues

[4] The defendant also concedes that the jury could reasonably have rejected the conclusion that any of the following constituted an "intervening cause" of the victim's death: the six week interval between the installation of the heater and the fatal fire; the neighbor's failure to install smoke detectors; the neighbor's operation during the night of an unattended heater; or, the defendant's explanation that "someone" had undone his proper wiring job and thereafter improperly rewired the heater to 240 volts.

that there was insufficient evidence from which the jury could have concluded beyond a reasonable doubt that he was subjectively aware of and consciously disregarded a substantial and unjustifiable risk that a death would result from his improper electrical work. Relying on *State* v. *Carpenter,* 214 Conn. 77, 570 A.2d 203 (1990), he maintains that: (1) the evidence presented by the state failed to preclude the reasonable hypothesis that his actions constituted only negligence and not recklessness; (2) the state had failed, therefore, to meet its constitutionally mandated burden of proof; and (3) he is consequently entitled to a judgment of acquittal.[5] The defendant contends, specifically, that the dangerousness of his conduct was not self-evident because the wiring of the heater was outwardly consistent with both a 120 volt and 240 volt installation and his mistake, if any, was not apparent.

We agree that the state must prove "every fact necessary to constitute the crime with which [the defendant] is charged" beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Avila,* 223 Conn. 595, 606, 613 A.2d 731 (1992); *State* v. *Carpenter,* supra, 82. Moreover, the jury must find the defendant not guilty if there is any conclusion that may be reasonably drawn

[5] As the discussion that follows makes clear, the defendant misconstrues our decision in *State* v. *Carpenter,* 214 Conn. 77, 570 A.2d 203 (1990). He limits his frame of reference to our holding in that case that the evidence presented by the state was insufficient to preclude the reasonable hypothesis that the defendant, out of frustration, had engaged in reckless conduct that caused the death of the victim. Id., 84–85. The defendant neglects, however, our conclusion that, although the cumulative effect of the circumstantial evidence of the defendant's conduct was insufficient to prove beyond a reasonable doubt that the defendant had the *specific* intent to cause the victim's death, a necessary element for a conviction of intentional murder pursuant to General Statutes § 53a-54a, we held that the defendant could properly be found guilty of the crime of manslaughter on the basis of the circumstantial evidence of his *general* intent. Id. We review in the present case the conviction of a defendant charged with a general intent crime.

from the totality of the evidence that is consistent with the innocence of the accused. *State* v. *Dyson,* 217 Conn. 498, 504, 586 A.2d 610 (1991); *State* v. *Carpenter,* supra, 84; *State* v. *Guilfoyle,* 109 Conn. 124, 139, 145 A. 761 (1929). This formulation is nothing more than a restatement of the fundamental principle stated in *In re Winship,* supra. The same rule, however, does not apply to inferences that the jury may draw from any particular fact or piece of evidence. See, e.g., *In re Keijam T.,* 221 Conn. 109, 118, 602 A.2d 967 (1992); *State* v. *Henning,* 220 Conn. 417, 422, 599 A.2d 1065 (1991) (" ' "[i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence" ' "); *State* v. *Tatem,* 194 Conn. 594, 598, 483 A.2d 1087 (1984) (" '[t]his process of inference is peculiarly a jury function, the raison d'etre of the jury system' "); *State* v. *Guilfoyle,* supra.[6]

" 'That the jury might have drawn other possible inferences from these facts is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt.' " *State* v. *Grant,* 219 Conn. 596, 604, 594 A.2d 459 (1991). " 'Emphasis needs to be placed on the distinction between the word "reasonable" and the word "possible." . . . Proof of guilt must exclude every reasonable supposition of innocence . . . . '[A] mere "possible hypothesis" of innocence will not suffice.' " *State* v. *Morrill,* 193 Conn. 602, 611, 478 A.2d 994 (1984); see *State* v. *Carpenter,* supra, 84. Although some evidence may be inconsistent with the state's theory of

---

[6] The defendant, in his brief, concedes as much: "The defendant is of course aware that the jury is not required to draw all *inferences* consistent with the innocence arising from each piece of evidence adduced at trial. On the other hand, 'any *conclusion,* reasonably to be drawn from [all] the evidence, which is consistent with the innocence of the accused must prevail.' [Emphasis in original; internal quotation marks omitted.] *State* v. *Dumlao,* 3 Conn. App. 607, [618, 491 A.2d 404] (1985)." (Emphasis added.)

the case, the jury is not bound to credit only that evidence to the exclusion of evidence consistent with the state's theory. *State* v. *Pinnock,* 220 Conn. 765, 775–76, 601 A.2d 521 (1992). The defendant's claim for acquittal springs from his supposition of inferences that the jury could have drawn while ignoring inferences consistent only with his guilt that the jury did reasonably draw.

We need, therefore, determine whether there was sufficient evidence to allow the jury to draw reasonable inferences consistent with the defendant's guilt to support his conviction of manslaughter in the second degree. The defendant argues that the jury could not reasonably have concluded that he was actually aware of and consciously disregarded a substantial and unjustifiable risk that a death would result from his improper installation of an electrical heater. We disagree.

A different standard applies to our appellate review of the evidence than that which guided the jury's consideration of the evidence. The jury's obligation was to acquit the defendant if there was any conclusion that *it* could reasonably have drawn from the totality of the evidence consistent with the innocence of the accused. *State* v. *Guilfoyle,* supra, 139. In contrast, our duty is to construe the same evidence in the light most favorable to sustaining the verdict. *State* v. *Famiglietti,* 219 Conn. 605, 609, 595 A.2d 306 (1991). This appellate standard accords with the appropriate respect for the constitutional role assigned to the jury in our system of jurisprudence. "We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." *State*

v. *Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984).

Consequently, we have "consistently employed a two-part analysis in appellate review of the sufficiency of the evidence to sustain a criminal conviction." *State* v. *Famiglietti,* supra. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." *State* v. *Montanez,* 219 Conn. 16, 19, 592 A.2d 149 (1991), and cases cited therein; *State* v. *Carpenter,* supra, 79. "In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Allen,* 216 Conn. 367, 380–81, 579 A.2d 1066 (1990); *State* v. *Carpenter,* supra. The defendant in the present case has not met his burden on appeal of establishing that there was insufficient evidence from which a reasonable jury could have found each essential element of the crime charged beyond a reasonable doubt. *State* v. *Robinson,* 213 Conn. 243, 254, 567 A.2d 1173 (1989).

To find the defendant guilty of manslaughter in the second degree pursuant to General Statutes § 53a-56 (a) (1), the state must have demonstrated, inter alia, that the defendant acted "recklessly." In order to satisfy this burden, the state must have proven that (1) the defendant was "aware of *and* consciously disregard[ed] a substantial and unjustifiable risk that . . . [death would] result," and (2) that the substantial and unjustifiable risk was of "such nature and degree that disregarding it constitute[d] a gross deviation from the standard of conduct that a reasonable person would [have]

observe[d] in the situation." (Emphasis added.) General Statutes § 53a-3 (13); see *State* v. *Ghiloni,* 35 Conn. Sup. 570, 573, 398 A.2d 1204 (1978).

The defendant does not claim that the evidence was insufficient for the jury to have concluded that his conduct constituted a gross deviation from the required standard of care. The defendant's claim is limited to his contention that there was insufficient evidence from which the jury reasonably could have concluded that he was actually aware of and consciously disregarded a substantial and unjustifiable risk that death would result from his conduct. The defendant concedes that the evidence was sufficient to demonstrate beyond a reasonable doubt that he should have been aware of such a risk.

In reviewing the sufficiency of the evidence, we acknowledge the accuracy of the defendant's claim that the state must have established that the defendant's awareness of the risk, and his conscious disregard of that risk, occurred at the same time that the defendant performed the actual conduct at issue—the improper wiring of the heater. See 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.1, p. 270. In other words, the necessary mens rea of the offense must have temporally coincided with the actus reus of the offense. We disagree, however, with the defendant that this principle bars the fact finder from considering the defendant's entire course of conduct in determining whether the defendant had the required mens rea at the time he engaged in the conduct constituting the offense.

We have long recognized that a defendant's state of mind can usually be proven only by circumstantial evidence. See, e.g., *State* v. *Grant,* 219 Conn. 596, 604, 594 A.2d 459 (1991); *State* v. *Morrill,* 193 Conn. 602, 610, 478 A.2d 994 (1984); *State* v. *Bzdyra,* 165 Conn.

400, 403, 334 A.2d 917 (1973). A defendant's state of mind "may be, and usually is, inferred from conduct." *State* v. *Cofone,* 164 Conn. 162, 164, 319 A.2d 381 (1972). This inquiry, however, has never been limited to an examination of the defendant's actions or statements at the precise moment the defendant engaged in the conduct constituting the offense. "Recognizing the difficulty in proving by direct evidence that an accused subjectively realized and chose to ignore a substantial risk . . . we have long held that the state of mind amounting to recklessness . . . may be inferred from conduct. See *State* v. *Bunkley,* 202 Conn. 629, 645, 572 A.2d 795 (1987); *Mooney* v. *Wabrek,* 129 Conn. 302, 308, 27 A.2d 631 (1942). It requires little extension of this principle to hold that such relevant conduct may constitute a course of behavior rather than one specific act." *State* v. *Edwards,* 214 Conn. 57, 66 n.7, 570 A.2d 193 (1990); see also *State* v. *Tucker,* 181 Conn. 406, 415, 435 A.2d 986 (1980) (although conduct prior to the offense did not in and of itself prove intent to murder, it was relevant to establish, in connection with the question of intent, a pattern of behavior and an attitude toward the victim that was indicative of the defendant's state of mind); *State* v. *Croom,* 166 Conn. 226, 230, 348 A.2d 556 (1974) ("evidence of the conduct of a defendant subsequent to the commission of a crime is admissible to show the defendant's state of mind at the time of the crime"). Consequently, in concluding that the evidence established beyond a reasonable doubt that the defendant was aware of and consciously disregarded a substantial risk that death would occur, the jury was free to consider the defendant's entire course of conduct as probative of his state of mind at the time he improperly wired the heater.

We turn now to the evidence elicited at trial, construed in the light most favorable to sustaining the verdict, from which the jury concluded that the defendant

was aware of and consciously disregarded a substantial risk of death. The defendant first conceded that he had installed the basement heater and had wired it to the circuit breaker. The jury then heard extensive testimony from the defendant that he was an experienced electrician with the most advanced license possible and that he had wired "tens of thousands of electrical baseboard heaters" similar to the heater he had installed in his neighbor's basement.[7] The defendant, who had also been an electrical inspector and had been licensed as such in Connecticut since 1984, further testified that he was aware that the main purpose of the national electrical code is to prevent fires and that he had attended seminars concerning the state's electrical code requirements.[8] From this evidence, the

---

[7] The defendant later testified concerning his use of the phrase "tens of thousands": "Well, it is a figment of speech. Thousands. I don't know how many thousand but I have been doing it for thirty-five years." (The defendant made reference to "thirty-five years" while the Appellate Court noted that the defendant was "a licensed electrician with thirty-one years experience." *State* v. *Salz*, 26 Conn. App. 448, 449, 602 A.2d 594 [1992]. The defendant served a four year apprenticeship before becoming a "licensed electrician." He passed an examination to qualify as an "E-2" journeyman electrician and another examination, after two years, to become an "E-1," an unlimited electrical contractor. We described the defendant, at the time of trial, as an electrician with thirty-five years experience who had been licensed for thirty-one years.)

[8] Section 29-262-5 of the Regulations of Connecticut State Agencies describes the duties and minimum qualifications of an electrical inspector: "(a) DUTIES: Under the direction of the Building Official or Assistant Building Official; performs inspectional work in examining new and old electrical installations to insure conformity with National Electrical Codes and other related regulations. Ordinarily the work involves enforcing the correction of defects or deviations from electrical codes at the scene of the installation by dealing directly with contractors.

"(b) MINIMUM QUALIFICATIONS: Completion of high school, vocational school or the equivalent; hold a valid E-1 'Unlimited Contractor's' license or an E-2 'Unlimited Journeyman's' license for not less than two (2) years. Appointees to this class must maintain or improve their license during their tenure.

"MUST POSSESS: a thorough knowledge of the National Electrical Code, the methods, materials and techniques of the electrical trade; a working

jury reasonably could have inferred that when the defendant improperly wired the basement heater he was aware of and consciously disregarded a substantial risk that the improper wiring of the heater could result in a severe electrical fire causing death to those who lived on the premises. The circumstantial evidence presented tended to demonstrate that an electrician of the defendant's apparent skill, expertise and experience would have had full knowledge of the catastrophic dangers of improper wiring.

The jury also heard testimony from several witnesses who testified to the cause of the fire and the quality of the electrical work performed by the defendant.[9] In particular, Acquarulo, an electrical inspector, testified regarding numerous electrical code violations he had encountered during his inspection of the premises. From this testimony, the jury reasonably could have found that the defendant, in violation of such codes, improperly: (1) wired a 120 volt heater to 240 volts of electrical current; (2) failed properly to connect the "BX" cable to the circuit panel; (3) installed the basement heater beneath an electrical outlet; (4) failed to install a mechanical tie between the two circuit breakers; (5) spliced the wire through the circuit breaker panel, which was full, rather than installing a "piggyback" circuit breaker; and (6) installed a heater with a defective thermostat. Acquarulo testified that these code violations are unusual and that he had never

knowledge of the CBBC and related codes; ability to diagnose defects and hazards in new and existing electrical installations; to enforce regulations with firmness, tact and impartiality, to establish and maintain effective working relationships with contractors, property owners and the general public; and the ability to express oneself clearly and concisely both orally and in writing."

[9] Acquarulo testified that a mechanical tie, or bar, connects the two circuit breakers required in a 240 volt installation. In the event that a fault occurs, the bar simultaneously disconnects both ungrounded conductors from the circuit by tripping both breakers.

before seen such a large number of violations on a single job. The testimony of the other state's witnesses was consistent with the substance of Acquarulo's testimony.

Given the extent and frequency of the code violations discovered, and the length and extent of the defendant's training and expertise, the jury reasonably could have inferred that the defendant had performed the work on his neighbor's house in such a slipshod manner that he, in fact, must have been aware of and consciously disregarded the risks that the code violations created for the residents. Indeed, the defendant in his brief admits that his lack of compliance was consistent with such a mental state, but contends that the jury also could have concluded that it was, at the same time, consistent with a state of mind evidencing only negligence.[10]

The jury heard further testimony that the state electrical code required the defendant to secure a permit from the town building department before engaging in the electrical work in question but that he did not do so. From this evidence, the jury reasonably could have inferred that the defendant knew that his work would not be inspected by the town, and that it was therefore unnecessary to perform his services in compliance with the applicable codes. The jury could also have inferred from the anticipated lack of oversight by the town that the defendant was aware of and chose to disregard the significant risks engendered by noncompliance with the codes. See, e.g., *State* v. *Little,*

[10] The defendant's claim, cast in a different light, is that he did not have an awareness of the potential harm but, in fact, only *should* have been aware of such a risk. Consequently, the defendant's argument is nothing more than a claim that the jury was not free to draw an inference from these facts that the defendant was aware of and consciously disregarded the risks. Although the defendant may not view this inference as the most likely one, he has not met his burden of demonstrating that the jury's decision to draw the inference was unreasonable.

194 Conn. 665, 673, 485 A.2d 913 (1984) ("[t]he jury may base an inference on facts it finds as the result of other inferences").

Furthermore, the jury heard testimony that the defendant told the homeowner that, unless a permit was obtained, the owner assumed all liability should a fire result from the electrical work. From this statement, the jury was free to find that the defendant was aware of the substantial risk of a fire if the work was not done in compliance with applicable codes and was not subject to inspection. From the defendant's expressed belief that he would not be liable for any resulting fire, moreover, the jury could reasonably have concluded that the defendant performed the work in violation of the code despite his awareness of the risk involved.

Finally, the jury heard testimony, seemingly in justification, that the defendant had performed the work for a "friend" rather than for profit, that the work was a "filler job," and that he had performed the work in short spurts on several occasions late in the day before he returned home from his regular employment. From this evidence, the jury could have found that the defendant knew that the work did not need to meet, and indeed did not meet, his usual standards, given the time of day that it was performed and his lack of a profit motive in performing it.[11] Consequently, the jury could reasonably have inferred that the defendant performed the work in a slipshod manner and in violation of applicable codes despite his awareness that noncompliance created a significant risk of a fire and a fire, the risk of death.

---

[11] The defendant testified that he was paid $1200 for what he considered to be a $3000 job.

Although the defendant offered testimony conflicting with the state's version of events,[12] the jury was free to disregard any or all of his testimony. See, e.g., *Berry* v. *Loiseau,* 223 Conn. 786, 614 A.2d 414 (1992). It is the jury's role to assess the credibility and weight to be accorded to each witness' testimony, including that of the defendant. See, e.g., *State* v. *Martin,* 189 Conn. 1, 9, 454 A.2d 256, cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983). Consequently, the jury, in assessing all the evidence, reasonably could have found that the physical evidence and evidence of the defendant's course of conduct in performing the electrical work was more persuasive in determining his culpability than the testimony of the defendant excusing his conduct and proclaiming his innocence.

Standing alone, no single piece of evidence establishes beyond a reasonable doubt that the defendant acted recklessly rather than negligently by improperly wiring the heater in a manner that resulted in a fire and the victim's death. We have often stated, however, that "[i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." *State* v. *Perez,* 183 Conn. 225, 227, 439 A.2d 305 (1981). We conclude that, construed in the light most favorable to sustaining the verdict, the plethora of circumstantial evidence and the reasonable inferences that could be drawn therefrom enabled the jury to have found proven beyond a reasonable doubt that the defendant was aware of and consciously disregarded a substantial risk of death when he improperly wired his neighbor's basement heater.

---

[12] For instance, the defendant testified that "someone" must have removed the "piggyback" circuit breaker and rewired the kitchen and basement heaters by splicing wires together, and that the locknut had melted in the fire.

The judgment of the Appellate Court is affirmed.

In this opinion PETERS, C. J., BORDEN and KATZ, Js., concurred.

BERDON, J., dissenting. Although it is a *very* close call,[1] I agree with the majority that viewing the evidence in this case in the light most favorable to sustaining the verdict; *State* v. *Rodriguez*, 223 Conn. 127, 146, 613 A.2d 211 (1992); *State* v. *Henning,* 220 Conn. 417, 420, 599 A.2d 1065 (1991); *State* v. *Famiglietti,* 219 Conn. 605, 609, 595 A.2d 306 (1991); the jury could reasonably have concluded that the defendant recklessly caused the death of the victim. I dissent, however, because in reading the jury instructions as a whole in conjunction with the state's argument, I believe there

---

[1] While I agree with the majority, I am troubled about the sufficiency of the evidence to support the defendant's conviction of reckless manslaughter. There is overwhelming evidence that the defendant was criminally negligent. A person is criminally negligent "when he fails to perceive a substantial and unjustifiable risk that . . . [death] will occur . . . . The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." General Statutes § 53a-3 (14). Had the jury convicted the defendant of criminally negligent homicide under General Statutes § 53a-58, I would have no trouble upholding their verdict. Reckless manslaughter, however, is a different crime.

Everyone concedes that the sole cause of the fire was the improper wiring of the 120 volt heater to a 240 volt circuit. Both a 120 volt heater and a 240 volt heater, however, require the connection of two wires. As the defendant argues, "[s]ince the fatal connection was as outwardly consistent with a safe installation as an unsafe one, the actual dangerousness of his misconduct was not self-evident." This, together with the fact that there was no conceivable motive for him to wire the 120 volt heater to a 240 volt circuit, troubles me greatly. Six separate negligent acts, even if predicated on electrical code violations, cannot be added together in order to satisfy the requirement of proving recklessness. As this court has repeatedly recognized, recklessness is a state of mind far different from negligence. *Dubay* v. *Irish,* 207 Conn. 518, 532, 542 A.2d 711 (1988); *State* v. *Bunkley,* 202 Conn. 629, 643, 522 A.2d 795 (1987). Nevertheless, under our current standard of review, which requires that we view the evidence in the light most favorable to sustaining the verdict, I cannot say that the verdict is unreasonable—only troubling.

is a "reasonable possibility" that the jury was misled. See *State* v. *Avila*, 223 Conn. 595, 607, 613 A.2d 731 (1992); *State* v. *Castonguay*, 218 Conn. 486, 498, 590 A.2d 901 (1991). Specifically, I think the instructions led the jury to believe that they could find the defendant guilty of reckless manslaughter even if his conduct was merely negligent.

I realize that the jury instructions were not part of the certified issue.[2] I believe, however, that the instructions, together with the prosecutor's characterization of this case during his closing arguments, are so interwoven with the sufficiency of the evidence issue that justice requires that the instructions be reviewed. See *State* v. *Casey*, 201 Conn. 174, 179–82, 513 A.2d 1183 (1986) (trial court's reading of an incomplete jury instruction was reversible error in view of the fact that the state's closing argument emphasized an issue that was not adequately covered by the instruction); *State* v. *Harris*, 182 Conn. 220, 231, 438 A.2d 38 (1980) (when passing on a fair trial claim, "we examine the whole record with a view toward determining whether the defendant's trial satisfied . . . [constitutional] standards"). Indeed, in *Nardini* v. *Manson*, 207 Conn. 118, 120 n.1, 540 A.2d 69 (1988), we held that "[w]hile Practice Book § 4138 . . . limits the issues the appellant may present to those raised in the petition for certification, we may, of course, suspend the limitation of § 4138 when the dictates of justice require a more expansive analysis. *State* v. *Hodge*, 201 Conn. 379, 382, 517 A.2d 621 (1986); *State* v. *Torrence*, 196 Conn. 430, 434, 493 A.2d 865 (1985)."[3]

---

[2] I alone voted on the petition for certification to consider the correctness of the jury instructions.

[3] In addition, Practice Book § 4187 provides: "The design of these rules being to facilitate business *and advance justice*, they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice.

"In the interest of expediting decision, *or for other good cause shown*, the supreme court may suspend the requirements or provisions of any of

Further, although defense counsel took exception to the recklessness instructions at trial, the portion of the Appellate Court opinion reviewing those instructions states that "[a]t trial, the defendant neither objected to [n]or took exception to the court's instructions on recklessness." *State* v. *Salz,* 26 Conn. App. 448, 454, 602 A.2d 594 (1992). The Appellate Court therefore reviewed the instructions under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989), and concluded that the defendant had failed to satisfy *Golding*'s third prong. That prong requires the defendant to prove that there was a clear constitutional violation that clearly deprived him of a fair trial. Id., 240. The Appellate Court also refused to invalidate the instructions under plain error review. See *State* v. *Salz,* supra, 454–57. The Appellate Court did not, however, review the instructions as a claim of error that was properly preserved at trial. This claim therefore has never received appropriate appellate review.

I

THE PROSECUTOR'S NEGLIGENCE ARGUMENT

The defendant claims that the prosecutor never argued to the jury that the defendant's conduct was reckless, but rather that the defendant acted with extreme negligence. The state does not refute this, but the majority ignores it. A review of the trial transcript makes clear that the prosecutor did indeed argue a negligence theory to the jury, even though he acknowledged that the state's burden was to prove that the defendant's conduct was reckless.

During closing argument, the prosecutor said that the defendant's work "was a sloppy job and more than

these rules in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction." (Emphasis added.)

sloppy," that it was done "on the run in a hurried lackadaisical fashion," that the defendant did a "horrendous job" and that he was probably tired when he performed the work. The prosecutor capped his first closing argument by stating the following: "[The defendant] is in a hurry, he has a 240 [volt] heater [in the kitchen] and 90 percent of all the heaters are 240 but he may have forgotten [that a 120 volt heater was being installed in the basement] . . . [s]o he splices [the wires from the two heaters] together. . . . Did [the defendant] forget [it was] a 120 [volt heater] and wire them together as if it was a 240 [?] No one will ever know. . . . [I]t was this incredibl[y] shabby and irresponsible work that was responsible for the fire . . . ." In his rebuttal argument, the prosecutor said that the defendant's work "was just incredibly gross and it was a deviation from any standard of conduct."

We recently emphasized the important role that closing argument plays in a criminal jury trial. "Closing argument is an integral part of any criminal trial, for it is in this phase that the issues are sharpened and clarified for the jury and each party may present his theory of the case." *State* v. *Arline,* 223 Conn. 52, 63, 612 A.2d 755 (1992). The state by its argument focused the jury on a negligence theory of culpability, and the jury instructions must be viewed in this context.

## II

### THE TRIAL COURT'S SUPPLEMENTAL INSTRUCTION ON NEGLIGENCE

We have long held that, "[i]f justice is to be done . . . it is of paramount importance that the court's instructions be clear, accurate, complete and comprehensible, particularly with respect to the essential elements of the alleged crime. *United States* v. *Clark,* 475 F.2d 240, 248 (2d Cir. [1973]) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Williamson,* 206 Conn. 685, 709, 539 A.2d 561

(1988). Unfortunately, the trial court's jury instructions were not clear and comprehensible with respect to the most critical element in this case: recklessness.

After the jurors had been deliberating for approximately four hours, they requested that the court reread the statutory definition of recklessness and the portion of the original charge dealing with recklessness. The following day, the trial court, instead of merely rereading the original charge as requested, launched into a befuddled and extensive definition of the reasonable person standard, ostensibly so that the jury could determine whether the defendant's conduct constituted "a gross deviation from the standard of conduct that a reasonable person would observe in the situation." General Statutes § 53a-3 (13). This charge was confusing because it suggested a level of culpability lower than recklessness. Further, the trial court never clearly explained to the jurors why it was instructing them on the reasonable person standard of care.

After reading the statutory definition of recklessness to the jury, the trial court recharged[4] as follows: "And

---

[4] The entire recharge of the jury was as follows: "Ladies and gentlemen, although your question asks only for a redefinition of the term, reckless, in that it is so involved with the crime of manslaughter in the second degree I am basically going to redefine that crime for you. It is a crime made up of substantially two elements. Number one, that the defendant acted recklessly, and number two, that the defendant's conduct in acting recklessly thereby caused the death of a person, and in this case that person being [the victim].

"Our statute defines the term, recklessly, again in these terms. 'A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such a result will occur or that such circumstance exists. The risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard that a reasonable person would observe in the situation.' Recklessly then means, one, being aware of a substantial and unjustifiable risk, and two, consciously disregarding that risk. There must be an awareness of the risk and a conscious disregard of it. These factors may and often can obviously be proved by circumstantial evidence as I have defined that term to you.

for purposes now I am going to define the standard of conduct that a reasonable person would observe in the situation." The trial court never told the jury for what purpose it was to use the definition. While this alone might not warrant reversal, it was followed by a long, elaborate explanation of the reasonable person standard of care that was suitable only for a civil negligence action. The trial judge stated the following: "The stan-

The risk must be substantial and unjustifiable. Furthermore, the risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in that situation. And for purposes now I am going to define the standard of conduct that a reasonable person would observe in the situation. The standard of conduct of a reasonable person in the same situation as the defendant is the doing of something which a reasonably prudent person would do under the circumstances or omitting to do what a reasonably prudent person would not do under the circumstances. Here obviously we are dealing with someone [sic] a reasonably prudent person acting as an electrician. Deviating from the standard of conduct of a reasonable person or failing to observe that standard of conduct is the failure to exercise reasonable care. Reasonable care is the care which a reasonably prudent person would use in view of the circumstances. It is not the care which the defendant felt it should have used. It is not the care of a careless person nor of an overly careful person, but it is the care of an ordinarily reasonably prudent person. You must determine the question of reasonable care by placing an ordinarily prudent person in the situation or circumstances in which the defendant found himself and then ask yourself what would a reasonably prudent person have done or not done in such a situation and under such circumstances. The circumstances must be judged and viewed as they reasonably appeared to the defendant at that time. This is a question of fact for you to determine. All the circumstances as you find them to be are to be considered and [in] circumstances of slight danger, a slight amount of care might be sufficient to constitute reasonable care. While in circumstances of great danger a correspondingly greater amount of care would be required to constitute reasonable care. Having determined what a reasonable person's conduct would have been in the circumstances you must then compare that conduct with the defendant's conduct.

"In order for there to be recklessness on the part of the defendant it is necessary that the defendant's conduct in disregarding a substantial and unjustifiable risk constitute a gross deviation from that standard of conduct that a reasonable person would have observed in the situation. Again a gross deviation is a great or substantial deviation not just a slight or moderate deviation. There must be a great or substantial difference. Let me read that again. There must be a great or substantial difference between on the

dard of conduct of a reasonable person in the same situation as the defendant is the doing of something which a reasonably prudent person would do under the circumstances or omitting to do what a reasonably prudent person would not do under the circumstances. Here obviously we are dealing with . . . a reasonably prudent person acting as an electrician. Deviating from the standard of conduct of a reasonable person or fail-

one hand the defendant's conduct in disregarding a substantial and unjustifiable risk, and on the other hand what a reasonable person would have done under the circumstances. The risk that the defendant disregarded must as I have said be substantial and unjustifiable. Whether a risk is substantial and unjustifiable is a question of fact for you to determine under all the circumstances. In this connection you should recall the testimony of all of the witnesses with regard to the causes and origins of the fire, the condition and quality of the work you find proven beyond a reasonable doubt to have been performed by the defendant, and then comparing those facts to the standard of recklessness that I have just given to you [to] determine whether you feel that the State has proven beyond a reasonable doubt recklessness on the part of the defendant.

"Now the second element of that crime is that if you should find recklessness to have been proven beyond a reasonable doubt you would then next have to find whether that conduct in fact caused the death of Burton Gorman. That means the defendant's conduct was the proximate cause of the victim's death. An act or failure to act is the proximate cause of death when it substantially and materially contributes in a natural and continuous sequence unbroken by any efficient intervening cause to the resulting death. It is the cause without which the death would not have occurred and the predominating cause, the substantial factor from which death follows as a natural, direct and immediate consequence.

"It is not necessary that the particular kind of harm that results from the defendant's acts be intended by him. When death or injury or the death caused by the defendant's conduct is foreseeable and a natural result of that conduct law considers the chain of legal causation unbroken and holds the defendant criminally responsible.

"Therefore, in order to find the defendant guilty you must find proven beyond a reasonable doubt that the defendant's conduct was reckless and that that conduct caused the death of Burton Gorman. If you feel the State has not proven either recklessness or that that conduct caused the death of Burton Gorman, if you fail to find either of those two factors proven beyond a reasonable doubt then your verdict would have to be not guilty. If you find both recklessness and causation proven beyond a reasonable doubt then your verdict would be guilty.

"That basically is the charge again."

ing to observe that standard of conduct is the failure to exercise reasonable care. Reasonable care is the care which a reasonably prudent person would use in view of the circumstances. It is not the care which the defendant felt it should have used. It is not the care of a careless person nor of an overly careful person, but it is the care of an ordinarily reasonably prudent person. You must determine the question of reasonable care by placing an ordinarily prudent person in the situation or circumstances in which the defendant found himself and then ask yourself what would a reasonably prudent person have done or not done in such a situation and under such circumstances. The circumstances must be judged and viewed as they reasonably appeared to the defendant at that time. This is a question of fact for you to determine. All the circumstances as you find them to be are to be considered and [in] circumstances of slight danger, a slight amount of care might be sufficient to constitute reasonable care. While in circumstances of great danger a correspondingly greater amount of care would be required to constitute reasonable care. Having determined what a reasonable person's conduct would have been in the circumstances you must then compare that conduct with the defendant's conduct."

The majority dismisses this confusing supplemental instruction by stating that the "definition was not given in a vacuum," and that the trial court used "recklessly" or "recklessness" nine times. I agree that the definition was not given in a vacuum. Nevertheless, it was given in a manner that could lead the jury to believe that recklessness was equated with negligence. In this short supplemental instruction, the trial court used phrases that connoted mere negligence *twenty times,* as follows: "standard of conduct of a reasonable person," twice; "standard of conduct that a reasonable person would observe," four times; "reasonably" or

"ordinarily" "prudent person," seven times; "reasonable person," twice; "failure to exercise reasonable care," once; "reasonable care," four times. A reasonable juror could not help but believe that proof of negligence was sufficient to convict the defendant.

This is further underscored because the jury did not have a lesser included offense instruction on negligent homicide; General Statutes § 53a-58;[5] and, therefore, did not have the benefit of the comparison. Neither the state nor the defendant requested such an instruction. Of course, the court on its own initiative could have given such an instruction. *State* v. *Rodriguez,* 180 Conn. 382, 408, 429 A.2d 919 (1980).

I agree with the defendant's trial counsel, who objected to this instruction as follows: "I believe the court's amended charge gets into the standard of a reasonably prudent person which is a charge related to ordinary negligence. I am not comfortable for what it is worth that the jury was now not given a lower standard than the gross deviation. The jury the way the charge was given may have picked up that ordinary negligence would be sufficient and I think it would be important to reinstruct them that they have to find a gross deviation from ordinary negligence."

The trial court's reply to the objection was as follows: "All right. Well, I think that is what the charge does. You probably know I have taken this directly out of [David] Borden and [Leonard] Orland's book which is a fuller definition with reference to this crime and I have read it out of that book exactly in the terms that they have done it in [see 5 Connecticut Practice, Con-

---

[5] General Statutes § 53a-58 provides in relevant part: "(a) A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person, except where the defendant caused such death by a motor vehicle." General Statutes § 53a-3 (14) provides the statutory definition of criminal negligence. See footnote 1.

necticut Criminal Jury Instructions (1986) § 8.5, pp. 257–58,] so if I am wrong, they are wrong, and you can have an exception and we will let some higher authority decide whether that is or is not a proper charge. I think obviously there is the language within the statute itself of a reasonable person, care of a reasonable person, and one has to define that. The earlier charge I used didn't and that has been the standard charge. Because of the importance of the term, recklessness, in this case that it applies to the facts here I felt in the recharge it would be more beneficial to use the broader and more complete charge which defines all of the words and I think it is clear in the latter part of that in dealing with the care of a reasonably prudent person that the charge makes it very clear that the conduct of the defendant has got to be gross and I think the language clearly does that and I would not want to attempt . . . at this point to improve on what I believe to be a proper statement of the law.''

Trial counsel took an appropriate exception as follows: ''May the record reflect I have an exception and the basic reason being that the charge as modified or amended seemed to suggest to the jury that the standard of care was that of a reasonably prudent person which would be ordinary negligence and they are indeed charged with the responsibility of gross deviation from that.''

There is a further problem with this supplemental instruction. The jury, as demonstrated by their request, was obviously having difficulty deciding whether the defendant's conduct rose to the level of recklessness. Reading the jury an expanded instruction that zeroed in on negligence twenty separate times was bound to mislead them on the issue of recklessness, especially since the instruction was given in response to a specific inquiry. See *State* v. *Williams*, 199 Conn. 30, 41, 505 A.2d 699 (1986) ('' 'A supplemental charge . . .

enjoy[s] special prominence in the minds of the jurors' because it is fresher in their minds when they resume deliberation. *Arroyo* v. *Jones,* 685 F.2d 35, 39 [2d Cir.], cert. denied, 459 U.S. 1048, 103 S. Ct. 468, 74 L. Ed. 2d 617 [1982]; see *Bollenbach* v. *United States,* 326 U.S. 607, 611–12, 66 S. Ct. 402, 90 L. Ed. 350 [1946]."); accord *State* v. *Gonzalez,* 222 Conn. 718, 726, 609 A.2d 1003 (1992). This supplemental instruction necessarily focused the jury on the standard of conduct of a reasonably prudent person—that is, a negligence theory.

A committee of our state judges has prepared a standard charge on reckless conduct.[6] This charge does not

---

[6] The standard charge on reckless manslaughter in the second degree prepared by the committee of judges is designed to eliminate any possibility of confusion with criminally negligent homicide. It reads: "The defendant is charged with the crime of manslaughter in the second degree, in that he recklessly caused the death of [     ], in violation of [General Statutes] § 53a-56 (a) (1) . . . . That statute, insofar as pertinent to this case, reads: 'A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person.'

"In order for the defendant to be found guilty of this offense, the state must prove two elements beyond a reasonable doubt: (1) that the defendant caused the death of [     ], and (2) that the death was caused by the reckless conduct of the defendant. There is no element of specific intent involved in this statute. The gist of the charge is recklessness. 'A person acts "recklessly" . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that such a result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in that situation.' The reckless offender is one who is aware of the proscribed risk and consciously disregards it and the serious consequences which may ensue. The next element that you must find that the state has proved beyond a reasonable doubt is that [     ] died as a result of the defendant's reckless conduct.

"If you find that the state has proved beyond a reasonable doubt that the defendant acted recklessly and that [     ] died as a result of that reckless conduct, you must find the defendant guilty of manslaughter in the second degree. If, however, you conclude that the state has failed to prove beyond a reasonable doubt one or more of these elements, you must find the defendant not guilty." Connecticut Selected Jury Instructions— Criminal (2d Ed. 1988) § 5.11, p. 5–31.

This instruction is substantially similar to one set forth in D. Wright, Connecticut Jury Instructions (2d Ed. 1975) § 698.

include an elaborate definition of the reasonable person standard, obviously because the drafters realized that such language could confuse a jury as to the culpability standard to be applied. The supplemental instruction on recklessness used in this case obviously had this effect on the jury. Only fifteen minutes after this confusing supplemental instruction was given, the jury returned a verdict of guilty on the charge of reckless manslaughter.

The supplemental instruction's emphasis of the reasonable person standard, coupled with the prosecutor's argument to the jury of a negligence theory of the case, requires that we reverse the conviction and remand the case for a new trial. Unfortunately, in preparing jury instructions, judges sometimes forget that they must be understood and applied by a group of six persons who usually have no training in the law. Indeed, it may be their first appearance in a court of law.

The majority would allow the state to deprive the defendant of his liberty for ten years even though the record clearly demonstrates that the verdict is unreliable. There is clearly a "reasonable possibility" that the trial judge's faulty supplemental instruction misled the jury, especially since the prosecutor had presented a negligence theory in his closing argument to the jury. When so much is at stake—that is, a person's liberty— the trial judge must ensure that he or she does nothing to confuse the triers of fact regarding the law they are to apply.

Accordingly, I respectfully dissent.