STATE OF CONNECTICUT *v.* JOHN MALONE
(15175)

Dupont, C. J., and Foti and Heiman, Js.

Argued November 30, 1995—decision released March 5, 1996

*Neal Cone,* assistant public defender, for the appellant (defendant).

*Susann E. Gill,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *C. Robert Satti, Jr.,* assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of the crime of murder for aiding the principal offender in violation of General Statutes §§ 53a-8[2] and 53a-54a (a).[3] The

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

[2] General Statutes § 53a-8 provides: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.

"(b) A person who sells, delivers or provides any firearm, as defined in subdivision (19) of section 53a-3, to another person to engage in conduct which constitutes an offense knowing or under circumstances in which he should know that such other person intends to use such firearm in such conduct shall be criminally liable for such conduct and shall be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

defendant claims that the trial court improperly (1) admitted a witness' probable cause hearing testimony in violation of the confrontation clauses of both the state and federal constitutions[4] and (2) instructed the jury on reasonable doubt and the presumption of innocence. The defendant also claims that the evidence was insufficient to support a conviction. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. The defendant, John Malone, a Bridgeport resident, regularly purchased drugs from a supplier in Manhattan and sold the drugs in Bridgeport. Luis Estrella, known as Augie, worked for the defendant selling drugs in Bridgeport. At some time prior to September 2, 1992, another drug dealer, known as Boone, suspected Estrella of stealing from him. Boone and the defendant purchased their drugs from the same supplier in Manhattan.

On September 2, 1992, a man known as Crypt arrived in Bridgeport and went to the defendant's apartment. Boone had hired Crypt, who worked for Boone's drug supplier, to kill Estrella. The defendant drove Crypt, in the defendant's Cadillac, to the Marina Village apartments in Bridgeport. The defendant exited the car and spoke briefly to Estrella in plain view of Crypt, who remained in the car. Sometime later, after the defendant had separated from Estrella, Crypt exited the defendant's car and walked up to a group of people that included, among others, Estrella and Harold "Bobbie" Hopkins. Crypt asked if anyone had any "dope." Estrella indicated that he did, and Crypt shot Estrella twice in the head. Estrella died from gunshot wounds to the head and neck. The defendant drove Crypt away from the crime scene in the defendant's Cadillac.

[4] The right of confrontation is guaranteed by the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.

The police interviewed the defendant the day following the murder. The defendant gave a written statement in which he did not mention Crypt, nor did he mention that he had given any adult male a ride to the Marina Village apartments the morning of the murder. The defendant did tell the police that he rode through the area with his two year old son in the car, and that he stopped and spoke briefly with Estrella and Hopkins before leaving the area.

Approximately one month later, the defendant gave a second statement to the police officers who arrested him on this murder charge. In this oral statement, the defendant stated that Crypt had arrived at the defendant's apartment on the morning of the shooting and asked the defendant to drive him to the Marina Village area. The defendant acknowledged that Crypt had visited his apartment previously and that Crypt worked for the defendant's New York drug supplier. The defendant also admitted that Estrella worked for him selling drugs, and that he had given Crypt a ride to the vicinity of the Marina Village neighborhood on the morning of the murder. The defendant, however, denied knowing that Crypt was armed and further denied knowing that Crypt intended to kill Estrella. The defendant claimed that he first saw a gun when Crypt exited his car. The defendant stated he heard shots shortly after Crypt exited his vehicle and soon thereafter witnessed Crypt running back to the car from around a building exclaiming, "Let's get out of here." The defendant stated that he drove Crypt back to his apartment and that Crypt later admitted that he had shot Estrella. According to the defendant, Crypt confessed that he had been hired to fulfill a contract to kill Estrella because Estrella had "ripped off" a drug dealer named Boone.

In his trial testimony, the defendant testified that Crypt had not been to his apartment the morning of the shooting, or at any previous time. The defendant

claimed that on the morning of the murder, as he left his apartment with his two year old son, a man, whom the defendant knew as Crypt, approached the defendant and asked him for a ride to the Marina Village apartments. The defendant recounted that he gave Crypt a ride and noticed that Crypt was armed when Crypt exited his car. The defendant stated that he parked the car and briefly spoke with Estrella. The defendant told the jury that he separated from Estrella, but was in the general vicinity of the Marina Village apartments when he heard three shots and saw Crypt run up to him, waving a gun. The defendant testified that Crypt ordered him at gunpoint to drive him away. The defendant stated that he agreed only after Crypt aimed the weapon at him.

I

The defendant first claims that the trial court improperly admitted into evidence the probable cause hearing testimony of Hopkins, a state's witness. In his testimony, Hopkins recounted a telephone conversation that he had had with the defendant on the day of the murder in which the defendant had asked Hopkins if he had seen what had happened to Estrella. Hopkins replied that he had seen Estrella get shot but he denied saying anything to the police. The defendant then told Hopkins to stick to his story and that Hopkins would be all right. Hopkins testified that later that day he saw the defendant and the defendant again instructed Hopkins to stick to his story, warning Hopkins that he could be next. Hopkins testified that the defendant stated that it was "kind of messed up" that Estrella was killed, but that Estrella "had to go." As to the shooting itself, Hopkins testified that on September 1, 1992, at approximately 9 a.m., Hopkins saw the defendant drive past in a green Cadillac with a brown-skinned man seated in the front passenger's seat and the defendant's son in the back seat. Hopkins explained that he later saw the

defendant exit his vehicle, approach Estrella and have a conversation with him. Hopkins stated that the defendant subsequently left and Estrella joined Hopkins and some others. Hopkins recalled that at that point, a man, other than the defendant, approached, asked about drugs and began shooting, hitting and killing Estrella.

Following Hopkins' direct testimony at the probable cause hearing, the prosecution furnished defense counsel with three prior statements that Hopkins had given to the police. Thereafter, defense counsel cross-examined Hopkins, and Hopkins described the height of the shooter, indicating that the defendant was not the shooter.[5]

At trial, following a hearing outside the jury's presence, the trial court found, for purposes of admitting Hopkins' prior testimony, that Hopkins was unavailable, that the state had made reasonable efforts to locate him, and that Hopkins had a reasonable basis for being unavailable.

In arguing that his confrontational rights were violated, the defendant points out that his cross-examination of Hopkins at the probable cause hearing was brief and limited. Moreover, the defendant maintains that his motive in cross-examining at the preliminary hearing differs significantly from his purpose in cross-examining at trial, especially given the fact that at the time of the probable cause hearing the defendant was charged as a principal, but at trial the defendant was charged as an accessory. The defendant also argues that the trial court improperly concluded that Hopkins was

---

[5] At the time of the hearing on probable cause on November 12, 1992, the defendant was charged with murder as a principal. On March 1, 1993, an amended information was filed alleging "John Doe" was the shooter and that the defendant had been an accomplice by aiding him.

unavailable at the time of trial, and that it was not harmless error to admit Hopkins' prior testimony.

"Cases involving the admission of an unavailable declarant's prior statements . . . [give] rise to Confrontation Clause issues because hearsay evidence was admitted as substantive evidence against the [defendant]." (Internal quotation marks omitted.) *State* v. *Outlaw*, 216 Conn. 492, 503, 582 A.2d 751 (1990). The sixth amendment to the United States constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." While the confrontation clause may bar the admissibility of evidence possibly admissible under an exception to the hearsay rule; *State* v. *Outlaw*, supra, 504; the right of confrontation is not violated by the substantive use of a prior statement if the declarant is unavailable, and if that statement bears adequate indicia of reliability. Id., 505.

We reject the defendant's claim that the de minimis cross-examination of Hopkins at the probable cause hearing should be sufficient to exclude the preliminary hearing testimony as contrary to state and federal rights of confrontation. Article first, § 8, of the Connecticut constitution provides that "[i]n all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ." The defendant can point to no authority, under either constitution, for the proposition that any particular type of cross-examination, as to duration or content, is a requirement that must be satisfied before that prior testimony may be admissible. Neither the state nor the federal guarantees of the right of confrontation require that a witness be present at trial for an actual cross-examination in order to admit prior testimony given under oath.

Under the facts of this case, we interpret the confrontation clause of the Connecticut constitution in the

same manner as its federal counterpart. We recognize that " '[t]he extent of cross-examination, whether at a preliminary hearing or at a trial, is a trial tactic.' " *State* v. *Parker*, 161 Conn. 500, 504, 289 A.2d 894 (1971), quoting *United States* v. *Allen*, 409 F.2d 611, 613 (10th Cir. 1969). The test is the opportunity for a full and complete cross-examination rather than the use made of that opportunity. *State* v. *Parker*, supra, 504. The confrontation clause, under our state constitution, "did not establish a new principle in criminal procedure; it merely secured an old principle whose earlier violation in England in political prosecutions had led to the incorporation of a similar provision in every State constitution . . . . The fundamental purpose in securing this right, 'to be confronted by the witnesses against him,' was to give to the accused the right of opportunity to cross-examine the witnesses against him . . . ." *State* v. *Torello*, 103 Conn. 511, 513, 131 A. 429 (1925).

The confrontation clause of our state constitution does not prevent the admission of prior testimony given under oath in another related proceeding. Our Supreme Court recognized, although not as a matter of constitutional interpretation, that "the testimony given at a probable cause hearing has the identical safeguards to insure reliability and trustworthiness as the testimony given at the trial." *State* v. *Parker*, supra, 161 Conn. 503.

We conclude that the defendant was given ample opportunity to cross-examine Hopkins. The defendant's voluntary and deliberate choice to conduct a limited inquiry of Hopkins cannot now be advanced as a basis on which to exclude Hopkins' testimony.

The defendant asserts that the state's initial information misled the defendant to believe that he was being charged as the shooter. The defendant asserts that, on the basis of the original charge, his purpose in cross-examining Hopkins was to establish whether the

defendant was the person who shot Estrella. The defendant maintains, however, that his motive in cross-examining Hopkins at trial, given the revised charge, would have been entirely different, and, thus, he was effectively denied the opportunity to cross-examine Hopkins. We find the defendant's arguments to be without merit.

As a matter of law, an accused charged with an offense is on notice that he may be convicted as an accessory to that crime. *State* v. *Steve*, 208 Conn. 38, 43–44, 544 A.2d 1179 (1988); *State* v. *Walton*, 34 Conn. App. 223, 230, 641 A.2d 391, cert. denied, 230 Conn. 902, 644 A.2d 916 (1994). Even though charged as a principal, a defendant may be convicted as an accessory as long as the evidence is sufficient to establish accessorial conduct. *State* v. *Williams*, 220 Conn. 385, 388, 599 A.2d 1053 (1991). The accessory statute itself does not provide a criminal offense, but rather an alternative theory under which liability for the underlying substantive crime may be proven. *State* v. *Walton*, supra, 230. Therefore, there is no practical difference in the label for purposes of establishing criminal responsibility. Id.

The primary focus of both the probable cause hearing and the defendant's trial was to determine whether the defendant committed the crime. Other substantive issues involved in both of these judicial proceedings were substantially similar. See *State* v. *Parker*, supra, 161 Conn. 504. We conclude that the original information charging the defendant with murder did not mislead the defendant in conducting the cross-examination of Hopkins nor deny the defendant an opportunity to confront or cross-examine Hopkins.

In addition to the defendant's claims of the denial of his opportunity to confront and cross-examine, the defendant asserts that the trial court improperly concluded that Hopkins was unavailable to testify at the

trial. The trial court has broad discretion in making a determination of unavailability, and its conclusion will be reversed on appeal only on a showing of a clear abuse of that discretion. *State* v. *Rivera*, 221 Conn. 58, 62, 602 A.2d 571 (1992). We conclude that the trial court did not abuse its discretion in finding that Hopkins was unavailable. Five witnesses testified as to Hopkins' unavailability, and our review of the record discloses that the evidence was sufficient to establish that the state had made a good faith effort to procure Hopkins' attendance by reasonable means. See *State* v. *Aillon*, 202 Conn. 385, 391, 521 A.2d 555 (1987). We see no valid purpose in reexamining evidence that so abundantly supports the trial court's conclusion as to unavailability.

As to the reliability of Hopkins' prior testimony, the defendant claims that the trial court improperly determined that Hopkins' statements were admissible as a prior testimony exception to the hearsay rule. The defendant argues that the trial court should have made an independent inquiry to determine whether the statement carried adequate indicia of reliability.

" 'Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.' " *State* v. *Outlaw*, supra, 216 Conn. 505, quoting *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). Prior testimony is a well rooted exception to the hearsay rule. *Ohio* v. *Roberts*, supra, 72–73; *State* v. *Weinrib*, 140 Conn. 247, 249–52, 99 A.2d 145 (1953). We conclude that Hopkins' testimony at the probable cause hearing qualified as admissible evidence at the trial under the prior testimony exception to the hearsay rule. Accordingly, the trial court properly deemed Hopkins' prior testimony to be reliable and admissible evidence.

II

The defendant next contends that the trial court's instructions to the jury on reasonable doubt and the

presumption of innocence diluted that standard and undermined that presumption.

The defendant's claims are unpreserved and he seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). The defendant acknowledges that instructions similar in language have been upheld by our Supreme Court on numerous occasions. *State* v. *Ellis*, 232 Conn. 691, 705–706, 657 A.2d 1099 (1995); *State* v. *Kelley*, 229 Conn. 557, 567–68, 643 A.2d 854 (1994); *State* v. *DePastino*, 228 Conn. 552, 572–73, 638 A.2d 578 (1994); *State* v. *Francis*, 228 Conn. 118, 134–35, 635 A.2d 762 (1993); *State* v. *Thomas*, 214 Conn. 118, 119, 570 A.2d 1123 (1990); *State* v. *Findlay*, 198 Conn. 328, 346, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986). The defendant further acknowledges that we are bound by the decisions of our Supreme Court.

The defendant has failed to demonstrate that his claims of improper instructions on reasonable doubt and the presumption of innocence satisfy the second prong of the *Golding* analysis.[6] Therefore, we will not review the defendant's claims.

### III

The defendant's final claim is that the evidence was insufficient to support the inference that he intentionally aided the shooter to kill the victim.

In reviewing claims of insufficiency, we first review the evidence presented at trial and construe it in the light most favorable to sustaining the verdict. *State* v. *Stanley*, 223 Conn. 674, 677, 613 A.2d 788 (1992). We then look at the facts established at trial and the reason-

---

[6] In order to prevail on a claim of constitutional error not preserved at trial, the second prong of the *Golding* analysis requires that a defendant assert a claim of constitutional magnitude alleging the violation of a fundamental right. *State* v. *Golding*, supra, 213 Conn. 239–40.

able inferences drawn from those facts, and decide whether the jury could have reasonably concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. Id., 678.

It is the jury's right and duty to draw reasonable and logical inferences from the evidence. *State* v. *Weinberg*, 215 Conn. 231, 255, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). It is also the jury's function to observe the conduct, demeanor and attitude of the witnesses and to gauge their credibility. *State* v. *Stepney*, 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). While we acknowledge that it appears that the defendant's conviction is premised, in large measure, on circumstantial evidence, we note that there is no legal distinction between direct and circumstantial evidence as far as probative force is concerned, and that it is not one fact, but the cumulative impact of a multitude of facts that establish guilt in a case involving substantial circumstantial evidence. *State* v. *Simino*, 200 Conn. 113, 117, 509 A.2d 1039 (1986).

In order to be convicted of murder as an accessory, the defendant must have had the intent to aid the principal and in so doing must have intended to commit the offense with which he is charged. *State* v. *Foster*, 202 Conn. 520, 525–26, 522 A.2d 577 (1987). The element of intent is ordinarily proven by circumstantial evidence and must usually be inferred from the defendant's conduct and the surrounding circumstances. *State* v. *Smith*, 35 Conn. App. 51, 63, 644 A.2d 923 (1994).

"Section 53a-8[7] requires that a defendant charged as an accessory have acted 'with the mental state required for commission of [the] offense.' An accessory, therefore, must only have the same intent as the principal. Furthermore, 'accessorial liability does not require that

[7] See footnote 2.

a defendant act with the conscious objective to cause the result described by the statute. . . . [That statute] merely requires that a defendant have the mental state required for the commission of a crime while intentionally aiding another.' " *State* v. *Nixon*, 231 Conn. 545, 554, 651 A.2d 1264 (1995). Here, the defendant could be convicted as an accessory to murder if he had the mental state required of the principal, i.e., the intent to cause the death of Estrella, while aiding Crypt.

Our review of the record, including the trial court's instructions to the jury, leads us to conclude that the jury could have found beyond a reasonable doubt that the defendant intentionally aided Crypt in the commission of the crime of murder. Because we have already set out the facts that the jury could have reasonably found, no purpose would be served by repeating those facts. We do, however, reiterate those specific facts that highlight the defendant's accessorial involvement in the crime.

The evidence presented as to the defendant's actions on the day of the murder are mostly undisputed. The defendant's claim, however, is that he did not know that Crypt was armed or that Crypt intended to kill Estrella. The jury had before it the defendant's testimony at trial and his two pretrial statements. They were free to consider the continually changing nature of the defendant's version of events, his conversations with Hopkins, his admitted knowledge of the alleged motive for the killing, and his knowledge of the relationship between the killer, the victim, and Boone. The jury cannot be expected to have left its common sense outside the jury deliberation room. It is very reasonable and probable that the jury would reject the possibility that an execution style killing could take place by a contract killer who had not planned how he would get to the scene of the killing, how he would identify his victim, or how he would depart from the murder scene.

The jury could properly find that the meeting between the defendant and Crypt was not a chance encounter, but rather, was a prearranged, intentional meeting, that the defendant identified the victim to Crypt, and that the defendant drove Crypt away after the killing.

The jury could also reject as more than coincidence that Crypt, after committing the shooting, ran toward the defendant and that the defendant just happened to be in the area with his car parked nearby. From the evidence presented, it was not unreasonable for the jury to have concluded that the defendant knew Crypt's purpose in coming to Bridgeport, knew that Crypt was armed, and, further, that the defendant aided Crypt in the commission of Estrella's murder. The jury was free to draw reasonable inferences from the facts found and to conclude that the cumulative force of the evidence established the defendant's guilt beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other judges concurred.