## STATE OF CONNECTICUT v. BOISE KIMBER
### (AC 15800)

O'Connell, C. J., and Hennessy and Cretella, Js.

---

Argued December 15, 1997—officially released March 24, 1998

*John R. Williams*, with whom, on the brief, was *Norman A. Pattis*, for the appellant (defendant).

*Michael E. O'Hare*, deputy assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Boise Kimber, appeals from the judgment of conviction, rendered after a jury trial, of larceny in the third degree in violation of General Statutes § 53a-124[1] and perjury in violation of Gen-

---

[1] General Statutes § 53a-124 (a) provides in relevant part: "A person is guilty of larceny in the third degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds one thousand dollars . . . ."

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

eral Statutes § 53a-156 (a).[2] On appeal, the defendant claims that the trial court improperly (1) denied his motion for judgment of acquittal of the larceny and perjury charges, (2) deprived him of his right to due process by failing to require the state to provide notice of the allegedly false statements used as the basis of the perjury charge and (3) violated his right to confront a witness against him, as guaranteed by the sixth amendment to the United States constitution. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. James Perkins owned and operated the Perkins Funeral Home in New Haven. In 1989, Perkins was convicted of a crime unrelated to this appeal and was sentenced to a term of imprisonment. Perkins' attorney, Julie Block, approached Armond McCoy, the accountant for the funeral home, and asked him to take a more active role in managing the financial affairs of the funeral home during Perkins' incarceration. McCoy agreed and began a review of the funeral home accounts and records. He discovered that the funeral home did not have a checking account and established one with Bank of Boston on February 27, 1989.

On May 10, 1989, Sidney Gimple, as conservator for Esther West, sent a check for $3600 to the Perkins Funeral Home in order to establish an "irrevocable funeral trust" to pay for West's funeral expenses upon her death. Earlier that year, the funeral home had also received checks from several other persons who wanted to prepay funeral expenses. McCoy decided that these funds should be deposited in a separate account to ensure that the assets would be available when

---

[2] General Statutes § 53a-156 (a) provides: "A person is guilty of perjury if, in any official proceeding, he intentionally, under oath, makes a false statement, swears, affirms or testifies falsely, to a material statement which he does not believe to be true."

needed. On May 18, 1989, McCoy deposited a total of $9057.16, which included the $3600 check sent by Gimple and the other funds received as prepayment of funeral costs, into an account with Bank of Boston.

Subsequently, Gimple learned that McCoy had commingled the funds intended to pay for West's funeral with moneys received to pay for the funerals of other persons. On May 25, 1989, Gimple sent a letter to the funeral home requesting that the funds he had provided to establish an "irrevocable funeral trust" on behalf of West be deposited in a separate trust account. As requested, McCoy withdrew the $3600 and set up a certificate of deposit (CD). The CD named the funeral home as the trustee of an "irrevocable funeral trust F/B/O Esther W. West." McCoy sent a copy of the CD to Gimple to confirm that he had complied with Gimple's request.

On November 17, 1989, McCoy withdrew the remaining funds and closed the account. With these funds, he obtained a second CD from Bank of Boston. The certificate issued for this account, however, did not provide that it was a trust account nor did it provide the names of any trustees or beneficiaries. It merely labeled the funeral home as the owner of the account.

On March 19, 1990, McCoy submitted a letter of resignation to Block, indicating that he would no longer provide his professional services to the funeral home. On or about that date, Perkins asked the defendant to become involved with the management of the funeral home. On April 20, 1990, McCoy and his attorney, John H. Peck, Jr., met with the defendant at Block's office. Peck turned over a box of funeral home business records that had been in the possession of McCoy. Included in these records were a list of documents and the two CDs opened by McCoy. Block signed a statement acknowledging receipt of the records. The

defendant also signed a handwritten statement that indicated an accounting discrepancy. Block turned these documents over to the defendant.

On June 29, 1990, the defendant went to the Hamden branch of Bank of Boston and spoke with a customer service representative, Richard Brown. Brown was aware that the defendant was associated with the funeral home. At the request of the defendant, Brown cashed the second CD, which was worth $8397.99. The defendant deposited $1397.99 into the funeral home checking account and took the remaining $7000 in cash. On August 21, 1990, the defendant again met with Brown and cashed the first CD that had been established as an "irrevocable funeral trust F/B/O Esther W. West," then worth $3963.30. The entire amount was again taken in cash.

In November, 1991, the defendant terminated his association with the funeral home. In May, 1993, Gimple spoke with a representative of Bank of Boston regarding the status of West's funeral trust account. He was informed that the account had been closed by the defendant in August, 1990, and was given copies of the bank's records to confirm the closing. Gimple sent a letter to the funeral home, a copy of which was sent to the defendant's residence, demanding that the assets of the trust be transferred to another funeral home located in New Haven.[3] When he received no response to his letter, Gimple filed a complaint with the department of consumer protection.

Neale Belgrade, an administrative hearing officer for the department, was assigned to investigate the com-

---

[3] The letters were sent via certified mail, return receipt requested. The letter sent to the funeral home was returned to Gimple as it was unclaimed by the addressee. The funeral home had gone out of business prior to the mailing of the letter. The letter sent to the defendant was signed by Pamela Kimber, his daughter, indicating that it had been received.

plaint. Belgrade requested that the defendant submit to an interview, to which the defendant consented. On November 24, 1993, at the department's office in Hartford, the defendant was interviewed. The interview was conducted under oath, and was tape recorded and later transcribed. The defendant subsequently was charged with larceny in the second degree, larceny in the third degree and perjury. The defendant was tried before a jury beginning on January 2, 1996. A motion for judgment of acquittal as to the charge of larceny in the second degree was granted on January 9, 1996. The jury returned verdicts of guilty of larceny in the third degree and perjury on January 18, 1996. This appeal followed.

I

The defendant's first two claims assert that the evidence presented was insufficient to sustain his conviction of larceny in the third degree and perjury.

"[W]e have consistently employed a two-part analysis in appellate review of the sufficiency of the evidence to sustain a criminal conviction. *State* v. *Salz*, 226 Conn. 20, 31, 627 A.2d 862 (1993). First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. Id. That the evidence is circumstantial rather than direct does not diminish the probative force of that evidence. *State* v. *Carpenter*, 214 Conn. 77, 79, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992). . . . *State* v. *DePastino*, 228 Conn. 552, 570, 638 A.2d 578 (1994)." (Internal quotation marks omitted.) *State* v. *Pulley*, 46 Conn. App. 414, 418–19, 699 A.2d 1042 (1997).

A

We turn first to the defendant's argument regarding his conviction of larceny in the third degree in violation of § 53a-124 (a) (2).[4] The defendant argues that the state presented insufficient evidence on the essential element of intent. We disagree.

"The elements of larceny . . . are: (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of it permanently; and (3) the lack of consent of the owner." (Internal quotation marks omitted.) *State* v. *Huot*, 170 Conn. 463, 467, 365 A.2d 1144 (1976). To prove the element of intent within the context of larceny, the state must show that the defendant intended to deprive another person of property permanently. See *State* v. *Harrison*, 178 Conn. 689, 694, 425 A.2d 111 (1979). Intent may be inferred by the fact finder from the conduct of the defendant. *State* v. *Cofone*, 164 Conn. 162, 164, 319 A.2d 381 (1972).

Construing the evidence in the light most favorable to sustaining the verdict and with all inferences reasonably drawn therefrom, the jury reasonably could have found the following facts. The defendant withdrew $3963.30 from the account held by the Perkins Funeral Home for the benefit of West using a certificate marked "irrevocable funeral trust F/B/O Esther W. West." When a demand was made on the defendant by a letter sent via certified mail, return receipt requested, and signed for by the defendant's daughter, for a transfer of the moneys held in trust to another funeral home, the defendant failed to return the moneys and ignored the request. From these facts alone, sufficient evidence was presented from which the jury reasonably could have inferred that the defendant intended to take funds from

[4] See footnote 1.

the account of West without her permission and that he refused to return them.

The defendant argues that his testimony to the jury that he did not know the meaning of an "irrevocable funeral trust" negated any evidence of intent presented by the state. Therefore, he claims, the state failed to prove intent. The defendant misconstrues our standard of review. It is not our function to decide the weight of evidence presented or the credibility of witnesses. We must determine whether there was sufficient evidence from which a jury reasonably could conclude that the defendant was guilty beyond a reasonable doubt of larceny in the third degree. See *State* v. *Salz*, supra, 226 Conn. 31. That the defendant presented contrary evidence is of no moment.

We conclude that sufficient evidence was presented from which a jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt.

### B

The defendant next claims that insufficient evidence was presented to sustain his conviction of perjury in violation of § 53a-156 (a). The defendant claims that the allegedly false statements concerned withdrawals made from the second CD and, therefore, there is no evidence that he made a false statement regarding a withdrawal from the first CD. We disagree.

Contrary to the defendant's assertion, the state did not charge the defendant with perjury for denying that he withdrew money from the irrevocable funeral trust of West. The specific language of the information charged that the defendant "intentionally, under oath, did testify falsely to a material statement which he does not believe to be true, to wit: denied withdrawing money from accounts established to deposit prepaid funeral arrangement money . . . ." These statements were

alleged to have been made at the formal investigatory hearing at the department of consumer protection.[5]

In the present case, the state presented extensive documentary evidence to support the allegation that

[5] At the hearing, the defendant was questioned by Belgrade, by assistant attorney general Lori Adeymi and by William Venezia, the assistant director of the fraud division of the department of consumer protection. The transcript of the November 24, 1993 hearing contained the following colloquy:

"Ms. Belgrade: Now as I said we were particularly interested in the prepaid funeral service area. Maybe you can tell us a little bit about the mechanics of how that worked at the funeral home?

"The Witness: The individuals would come in and make prearrangements for funerals and—

"Ms. Belgrade:—And that was either for themselves—

"The Witness:—For themselves or for a loved one. And usually that money was turned over to Mr. McCoy. It was put into a trust fund at the Bank of Boston.

"Ms. Adeymi: Do you have knowledge that it was put into a trust fund?

"The Witness: Yeah, I have knowledge of that.

"Ms. Adeymi: Did you ever go to the bank yourself?

"The Witness: I never went to the bank myself but I have knowledge of—

"Ms. Adeymi: What kind of knowledge do you have that it was put into a trust fund?

"The Witness: From Mr. McCoy. . . .

"Ms. Adeymi: With the prearrangements, when people come in to make prearrangements, all those are placed into a separate trust fund account so anyone that came in, all of those funds would be placed into a separate trust fund account?

"The Witness: Separate trust fund.

"Ms. Adeymi: Which was maintained at the Bank of Boston?

"The Witness: Bank of Boston, yeah.

"Ms. Belgrade: And that was just one account?

"The Witness: One account.

"Ms. Adeymi: But several—I understand there is one account but several people would—anybody, say for instance you had ten people in three months who made prearrangements, all of those people's funds would be put into that same one account?

"The Witness: In the trust account.

"Ms. Adeymi: Right, okay.

"Ms. Belgrade: And it was a regular savings account then?

"The Witness: The only thing I know is that it was a trust account, that's what I know. It was a trust account and I think on the document it had a trust account.

"Ms. Adeymi: So you have seen some documentation that there was a trust account?

"The Witness: Yeah.

the defendant testified falsely. "In appropriate circumstances, belief of falsity may be inferred by proof of the falsity itself. *La Placa* v. *United States*, 354 F.2d 56, 59 (1st Cir. 1965), cert. denied, 383 U.S. 927, 86 S. Ct. 932, 15 L. Ed. 2d 846 (1966)." *State* v. *Fantasia*, 5 Conn. App. 552, 555, 500 A.2d 968 (1985), cert. denied, 199 Conn. 806, 508 A.2d 33 (1986). It is clear that the defendant knew that the second CD was a trust account used to hold payments for prepaid funeral arrangements and that the defendant denied withdrawing any money from this account. It is equally clear and overwhelmingly supported by the record that the defendant withdrew money from this account as well as from the first CD, as evidenced by the defendant's signature on the redemption receipts. Construing the evidence in the light most favorable to sustaining the verdict and with all inferences reasonably drawn therefrom, overwhelmingly sufficient evidence existed from which the jury could have found beyond a reasonable doubt that the defendant was guilty of perjury.

## II

The defendant also claims that the trial court improperly denied his motion for a further bill of particulars regarding the perjury count. The defendant's specific claim on appeal is that the trial court improperly failed

---

"Ms. Belgrade: And the people that had access to it were Mr. Perkins and Mr. McCoy?

"The Witness: That's whose name was on that account.

"Ms. Belgrade: Okay, did you ever withdraw money from that account?

"The Witness: No, I haven't.

"Ms. Belgrade: Did you ever witness either Mr. Perkins or Mr. McCoy withdraw money from that account?

"The Witness: No.

"Ms. Belgrade: So as far as you know money went into that account and was not withdrawn or did you ever know of withdrawal from that account?

"The Witness: I actually didn't know personally but heard of withdrawals from the account."

to grant the motion for a bill of particulars as to in "exactly what respect the said statement is alleged to have been false." The defendant argues that this error deprived him of his constitutional right to be informed of the charges against him and to prepare a defense. We are unpersuaded.

Additional facts are necessary to our resolution of this claim. On October 27, 1995, the state filed an amended information in response to the defendant's motion for a bill of particulars in which the state charged that "on or about November 24, 1993, [the defendant] intentionally, under oath, did testify falsely to a material statement which he does not believe to be true in violation of § 53a-156 (a) . . . ." On December 21, 1995, the defendant filed a second motion for a bill of particulars requesting that the state (1) identify the statement alleged to be false and (2) declare in what respect it is false.

A hearing on the further bill of particulars was held before the trial court, which granted the request as to question one and denied it as to question two. On January 11, 1996, the state filed an amended long form information, which added the following language to the perjury charge, "to wit: denied withdrawing money from accounts established to deposit prepaid funeral arrangement money, in violation of § 53a-156 (a)."

"The sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution guarantee a criminal defendant the right to be informed of the nature and cause of the charges against him with sufficient precision to enable him to meet them at trial. *State* v. *Cates*, 202 Conn. 615, 625–26, 522 A.2d 788 (1987); *State* v. *Franko*, 199 Conn. 481, 490, 508 A.2d 22 (1986); *State* v. *Stepney*, 191 Conn. 233, 240, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). [That] the offense should be

described with sufficient definiteness and particularity to apprise the accused of the nature of the charge so he can prepare to meet it at his trial . . . are principles of constitutional law [that] are inveterate and sacrosanct. *State* v. *Sumner*, 178 Conn. 163, 166, 422 A.2d 299 (1979); *State* v. *Scognamiglio*, 202 Conn. 18, 22, 519 A.2d 607 (1987); *State* v. *Franko*, supra [490]; *State* v. *Stepney*, supra [240]. . . . The defendant has the burden of showing why the particulars are necessary to the adequate preparation of his defense. *State* v. *Stepney*, supra [240–41]. The denial of a motion for a bill of particulars is within the sound discretion of the trial court and will be overturned only upon a clear showing of prejudice to the defendant. *State* v. *Frazier*, 194 Conn. 233, 237, 478 A.2d 1013 (1984); *State* v. *Stepney*, supra [240–41]." (Internal quotation marks omitted.). *State* v. *Laracuente*, 205 Conn. 515, 518–19, 534 A.2d 882 (1987), cert. denied, 485 U.S. 1036, 108 S. Ct. 1598, 99 L. Ed. 2d 913 (1988).

A bill of particulars must allege facts with sufficient precision to enable the defendant to meet them at trial; exact precision is not required. The amended information charged that the defendant committed perjury, "to wit: denied withdrawing money from accounts established to deposit prepaid funeral arrangement money, in violation of § 53a-156 (a)." We fail to see how the defendant could have been uninformed regarding the nature of the charges against him and why "exactly what respect the said statement is alleged to have been false" was necessary to his defense. The defendant's claim to the contrary is without merit.

### III

The defendant next claims that the trial court unconstitutionally restricted his cross-examination of Block, the attorney for the funeral home.[6] The defendant

---

[6] At trial, the defendant claimed that the trial court improperly restricted his cross-examination of Block in violation of the sixth amendment to the

argues that the questions he wanted to pose were relevant to show Block's motive and bias, and to show prior misconduct. On appeal, the defendant asserts that Block's motive for testifying was to curry favor with the state in order to avoid prosecution for her own misdeeds and that he should have been allowed to present this theory to the jury. We disagree.

The state called Block as a witness for the purpose of establishing that she had received a box of documents during a meeting with Peck, McCoy and the defendant. Block testified that she regularly dealt with the defendant and that she had turned the contents of the box over to him. This evidence was pertinent because the first CD was one of the documents in that box.

During the cross-examination, a total of four objections were made by the state, one of which was overruled. The purported "restriction" on cross-examination put into issue on appeal by the defendant was part of the following colloquy.

"Q. You represented Perkins Funeral Home during the time that Mr. Perkins was in jail, is that right?

"A. Yes—well, part of the time.

"Q. And during that period of time did Mr. McCoy tell you that there were activities going on that were illegal?

United States constitution and article first, § 8, of the Connecticut constitution. In his brief, however, the defendant raises only the alleged violation of the sixth amendment right to confrontation.

"[W]e interpret the confrontation clause of the Connecticut constitution in the same manner as its federal counterpart" and therefore look to both federal and state case law to resolve this issue. *State* v. *Malone*, 40 Conn. App. 470, 476–77, 671 A.2d 1321, cert. denied, 237 Conn. 904, 674 A.2d 1332 (1996). We rest this holding, however, not only on the requirements of the federal constitution, but also on independent and adequate state constitutional grounds. U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8; see *Michigan* v. *Long*, 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); *State* v. *Jarzbek*, 204 Conn. 683, 707-708, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988).

"The State: Object. I don't see the relevance.

"The Court: Sustained.

"The State: Thank you.

"Q. Showing you defendant's exhibit ten. Do you remember receiving this letter?

"A. No, I don't remember receiving it.

"Q. Now, when you say you don't remember receiving it, does that mean that you did not or that you don't remember whether or not you received it?

"A. The second, I don't remember whether or not.

"Q. Do you remember it being brought to your attention by Mr. McCoy that the employees at Perkins Funeral Home were being paid under the table?

"The State: Object. Beyond the scope of direct and relevance, Your Honor.

"The Court: Sustained.

"Q. Do you remember [it] being brought to your attention that Perkins' money was being laundered—

"The State: Object.

"Q.—through the account of one, Norman Bell—

"The Court: Sustained."

Several more questions were asked of the witness before the defendant stated that he had no further questions. The witness was excused and out of the presence of the jury, the defendant stated that the questions objected to by the state and sustained by the trial court were relevant to show bias and motive. Specifically, the defendant argued for the record that (1) he was attempting to show that Block was exposed to the possibility of criminal liability and therefore had a motive to curry favor with the state, and (2) the questions were

relevant to impeachment as evidence of prior misconduct relating to the issue of credibility.

"The right to confrontation is fundamental to a fair trial under both the federal and state constitutions. *Pointer* v. *Texas,* 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *State* v. *Jarzbek,* 204 Conn. 683, 707, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988); *State* v. *Reardon,* 172 Conn. 593, 599–600, 376 A.2d 65 (1977). It is expressly protected by the sixth and fourteenth amendments to the United States constitution; *Davis* v. *Alaska,* 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Pointer* v. *Texas,* supra [403]; and by article first, § 8, of the Connecticut constitution. *State* v. *Torello,* 103 Conn. 511, 513, 131 A. 429 (1925)." (Internal quotation marks omitted.) *State* v. *Cassidy,* 236 Conn. 112, 122, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996).

"The primary interest secured by the confrontation clause of the sixth amendment is the right to cross-examination. *Douglas* v. *Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); *State* v. *Randolph,* 190 Conn. 576, 591, 462 A.2d 1011 (1983); *State* v. *Wilson,* 188 Conn. 715, 720, 453 A.2d 765 (1982)." *State* v. *Milum,* 197 Conn. 602, 608, 500 A.2d 555 (1985). " 'The confrontation right, however, is not absolute and is subject to reasonable limitation. *State* v. *Vitale,* 197 Conn. 396, 401, 497 A.2d 956 (1985).' " *State* v. *Lewis,* 220 Conn. 602, 621, 600 A.2d 1330 (1991). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination . . . or interrogation that is repetitive or only marginally relevant." *Delaware* v. *Van Arsdall,* 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

"The defendant relies upon the holding of *Davis* v. *Alaska,* [supra, 415 U.S. 308] that undue restriction upon

cross-examination of prosecution witnesses for bias or interest, particularly with respect to bargains made concerning the disposition of criminal charges against those witnesses, violates the constitutional right of confrontation. See *State* v. *Annunziato*, 174 Conn. 376, 379, 387 A.2d 566 (1978). That principle is wholly inapplicable to the questions which are the subject of the rulings challenged here. Not only do these inquiries make no reference to pending criminal charges against the [witness], whether formally presented or at some preliminary stage, but no claim of such a purpose was made at trial. Facially the questions appeared to be designed to attack the character of the [witness] by proof of prior specific acts of misconduct other than felony convictions in violation of the general prohibition against such evidence. *State* v. *Zdanis*, 173 Conn. 189, 191, 377 A.2d 275 (1977); *State* v. *Martin*, 170 Conn. 161, 167, 365 A.2d 104 (1976); *Richmond* v. *Norwich*, 96 Conn. 582, 597, 115 A. 11 (1921); *Verdi* v. *Donahue*, 91 Conn. 448, 454, 99 A. 1041 (1917). The exception, which allows, in the discretion of the trial court, proof of particular acts having a special significance upon the issue of veracity, cannot be said to require the admission of evidence that a witness has engaged in an unrelated [and uncharged misconduct] at some time in the past. *Vogel* v. *Sylvester*, 148 Conn. 666, 675, 174 A.2d 122 (1961); *Shailer* v. *Bullock*, 78 Conn. 65, 69, 61 A. 65 (1905). . . . The defendant was not inhibited by these rulings from exploring the motivations of the witnesses for testifying in relation to the disposition of any pending criminal charges . . . ." *State* v. *Orsini*, 187 Conn. 264, 268–69, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982).

The judgment is affirmed.

In this opinion the other judges concurred.