******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MARK HAYWARD
(AC 36257)

Lavine, Mullins and Mihalakos, Js.

*Argued September 7—officially released December 20, 2016*

(Appeal from Superior Court, judicial district of
Fairfield, Blawie, J.)

*Matthew C. Eagan*, assigned counsel, with whom
were *Michael S. Taylor*, assigned counsel, and, on the
brief, *James P. Sexton*, assigned counsel, for the appellant (defendant).

*Adam E. Mattei*, assistant state's attorney, with
whom, on the brief, were *John C. Smriga*, state's attorney, and *Cornelius P. Kelly*, supervisory assistant
state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Mark Hayward, appeals from the judgment of conviction, rendered after a jury trial, of larceny in the first degree in violation of General Statutes §§ 53a-119 and 53a-122 (a) (2). On appeal, the defendant claims that there was insufficient evidence to prove beyond a reasonable doubt that he intended to permanently deprive the victim of his property. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, Ronald Runk, met the defendant in September, 2008. After the victim told the defendant that he had written two books and recorded music, the defendant claimed that he was in the business of marketing and distributing books like those of the victim and that he was interested in selling records. Consequently, the defendant and the victim entered into a written agreement whereby the defendant agreed to market one of the victim's books. The defendant also became involved in selling the victim's record.

In December, 2008, the defendant and the victim discussed the defendant's limited liability company, Mark I Group, which was in the business of marketing corporate gifts. Following these discussions, the victim agreed to invest $34,000 in the Mark I Group.

Shortly thereafter, the defendant met with the president of Steiner Direct, a nationwide sports memorabilia company. In September, 2009, after developing a prototype of a keychain filled with dirt from Yankee Stadium, the defendant and Steiner Direct entered into a formal agreement for the manufacturing and selling of keychains. The defendant informed the victim of the agreement.

Beginning in February, 2009, the defendant began to ask the victim for money beyond the $34,000 investment.[1] In an e-mail dated February 12, 2009, the defendant asked the victim for $2500 to market the victim's book. The victim wired $2500 to the defendant's Mark I Group account. In an e-mail dated February 19, 2009, the defendant asked the victim for $6500, which he claimed was needed to pay backdated taxes on his Barclays Bank account containing over $1.2 million and to pay for airfare so that the defendant could travel to London to access the funds. The defendant stated that the $6500 loan would be a repayable loan against the Barclays Bank funds. The victim wired $6500 to the Mark I Group account. In an e-mail dated February 25, 2009, the defendant asked the victim for $3200, claiming that the bank gave the defendant the wrong details and that the amount needed to pay the taxes was $6700. The victim wired $3200 to the Mark I Group account.

Sometime after the February 25, 2009 e-mail, the defendant showed the victim a letter purporting to be from Carl Hynes, the Premier Operations Director of

International Accounts at Barclays Bank. Dated April 4, 2009, the letter stated that the Barclays Bank account contained $1,223,000 and that an advance of $30,000 was to be wired to the Mark I Group account on May 2, 2009.

On April 11, 2009, the defendant informed the victim that he needed $2750 because the defendant had miscalculated the mold cost of the keychains, and, therefore, he was short $2750. The defendant stated that he would give the victim a check for $2750, dated May 3, 2009, when he expected the $30,000 from his Barclays Bank account to clear. The victim wired $2750 to the Mark I Group account. On April 16, 2009, the defendant asked the victim for $3850, stating that the defendant had not accounted for the gift box for the keychains. The victim wired $3850 to the Mark I Group account. On April 23, 2009, the defendant asked the victim for $6000, stating that he needed the money to start promoting the keychains and to eat until funds arrived. The defendant also promised the victim a further 5 percent in the keychain deal because of the support the victim had given him. The victim wired $6000 to the Mark I Group account.

Sometime before May 7, 2009, the victim asked the defendant for collateral for the money lent. In response, the defendant gave the victim a pearl necklace, five paintings, and a clock. A jeweler appraised the pearl necklace at $1200. Although not appraised, the paintings were examined by an employee of a New York City gallery and were determined to be worth approximately $2000. Sotheby's, Inc. determined that the clock, which the defendant stated was from Prince Juan Carlos of Germany and potentially quite valuable, was worthless.

On May 7, 2009, the defendant asked the victim for $7000, stating that he needed the funds for a business trip. The defendant also stated that he would cover the amount loaned as soon as he returned from his trip. The victim wired $7000 into the defendant's personal bank account. On the same day as the e-mail, the defendant purported to receive a second letter from Hynes at Barclays Bank. The letter stated that the $30,000 transfer from the Barclays Bank account was delayed. The defendant showed the victim the letter.

On June 9, 2009, the defendant asked the victim for $3600, stating that he needed the money to close the Barclays Bank account. The defendant also stated that this would be the last loan for which he would ask, and that he was aware of his obligation to the victim and would repay him. The victim wired $3600 into the defendant's personal bank account. On July 20, 2009, the defendant asked the victim for $7500, stating that he needed the money for working capital. In this e-mail, the defendant also reassured the victim that he would bring a Barclays Bank check for 35,000 sterling, the equivalent of $57,750. The victim wired $7500 to an

account for Field of Dreams, LLC, of which the defendant was the chief operating officer. Thereafter, the defendant gave the victim a check for 35,000 British pounds, dated August 8, 2009, on Barclays Bank stationary. In addition, the defendant showed the victim another letter from Barclays Bank, dated July 17, 2009, stating that the defendant could access the funds.

The victim lent the defendant a total of $50,100. By late November, 2009, the victim had become suspicious and called Barclays Bank in London. He was put in touch with the bank's fraud investigation group, which determined that Barclays Bank never sent the three letters and that Hynes did not author them.[2] Moreover, Barclays Bank determined that the check for 35,000 British pounds was not genuine. The victim told the defendant that he had learned that the letters were false.

The victim attempted to collect on the loan of $50,100; on more than one occasion, the defendant agreed to repay part of the loan by a certain date, but the defendant never made any payment. On February 4, 2010, the defendant proposed a three stage repayment plan starting on March 5, 2010, but, again, no payment was made. Yet, in February, 2010, the defendant, through Field of Dreams, LLC, purchased $13,750 worth of keychains. At the end of 2010, after not receiving any repayment, the victim went to the Fairfield Police Department.

The defendant was arrested on January 14, 2012, and charged with larceny in the first degree in violation of §§ 53a-119[3] and 53a-122 (a) (2),[4] and forgery in the third degree in violation of General Statutes § 53a-140.[5] With regard to the larceny charge, the defendant was charged specifically on the theories of obtaining property by false pretenses[6] and obtaining property by false promise.[7] Following a jury trial, the defendant was convicted of larceny in the first degree. The trial court sentenced the defendant to seven years incarceration, execution suspended after eighteen months, followed by five years of probation. In addition, the court ordered the defendant to pay the victim restitution in the amount of $50,100, $4975 of which was due within ten days of the order, and the remaining $45,125 of which was to be paid in monthly installments during the probation period. Additional facts will be set forth as necessary.

The defendant claims that there was insufficient evidence to support his conviction of larceny in the first degree. Specifically, he contends that, although he fraudulently obtained $50,100 from the victim, the jury lacked sufficient evidence to find beyond a reasonable doubt that the defendant intended to deprive the victim of his money permanently.[8] In support of his argument, the defendant points to the state's failure to offer evidence that he did not use the money to advance a legitimate business venture and that he did not intend

to pay the victim back from the profits generated by the business. We disagree.

We first set forth our standard of review and the relevant law. "The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [as] we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of

guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Sam*, 98 Conn. App. 13, 32–34, 907 A.2d 99, cert. denied, 280 Conn. 944, 912 A.2d 478 (2006).

"A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." General Statutes § 53a-119. "To 'deprive' another of property means (A) to withhold it or cause it to be withheld from him permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to him, or (B) to dispose of the property in such a manner or under such circumstances as to render it unlikely that an owner will recover such property." General Statutes § 53a-118 (3).

"Connecticut courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner. . . . Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing. . . . Larceny involves both taking and retaining. The criminal intent involved in larceny relates to both aspects. The taking must be wrongful, that is, without color of right or excuse for the act . . . and without the knowing consent of the owner. . . . The requisite intent for retention is permanency." (Internal quotation marks omitted.) *State* v. *Flowers*, 161 Conn. App. 747, 752, 129 A.3d 157 (2015), cert. denied, 320 Conn. 917, 131 A.3d 1154 (2016). "Intent may be inferred by the fact finder from the conduct of the defendant." *State* v. *Kimber*, 48 Conn. App. 234, 240, 709 A.2d 570, cert. denied, 245 Conn. 902, 719 A.2d 1164 (1998).

In the present case, our review of the record in the light most favorable to sustaining the verdict discloses that sufficient evidence existed from which the jury could have found beyond a reasonable doubt that the defendant committed larceny in the first degree. Specifically, the record reveals sufficient circumstantial evidence that, taken together, strongly supports the finding that the defendant acted with the requisite intent to deprive the victim of his property permanently. The defendant admitted that he fraudulently obtained the money from the victim, stating that he "used deceptive means to secure funds from [the victim]." Such deceptive means included presenting the victim with three false letters from Barclays Bank. These letters indicated that an account at the bank had a balance of $1,223,000. The account, however, did not have any money, but rather had a negative balance due to the fact that the defendant never made any deposits and never paid the

maintenance fees charged to the account.[9]

The defendant argues that the falsity of the letters confirms only that his finances were not what he said they were, but that they do not touch on his intent. The jury, however, is entitled to bring its common sense and experience into the courtroom. See *State* v. *Flowers*, supra, 161 Conn. App. 757. The jury reasonably and logically could have concluded that, by falsely indicating through the letters that he had substantial funds, the defendant suggested that he could and would repay the victim, and, therefore, convinced the victim to transfer money. In light of this pattern of deception, the jury reasonably could have found that the defendant gained control of the victim's money with the intent to deprive the victim of it permanently.

Moreover, the defendant never repaid the victim any of the $50,100, despite the victim's requests. See *State* v. *Kimber*, supra, 48 Conn. App. 240–41 (withdrawing money from account without permission and ignoring requests to return money is sufficient evidence from which jury could infer that defendant never intended to repay money). Outside of some collateral and a worthless check for 35,000 British pounds, the defendant only spoke of repayment, and mere words are insufficient to support the claim that the defendant actually intended to repay the victim. See *State v. Torres*, 111 Conn. App. 575, 587–88, 960 A.2d 573 (2008), cert. denied, 290 Conn. 907, 964 A.2d 543 (2009) (voluntarily offering to repay forged check is not sufficient for jury reasonably to find that defendant acted in good faith).

Furthermore, after the defendant had accrued a loan with the victim and promised repayment, the defendant, through Field of Dreams, LLC, paid $13,750 for keychains. Despite having the means to make such a substantial purchase, the defendant did not attempt any repayment to the victim. In fact, the victim still had not been repaid any part of the $50,100 at the time of trial, which occurred three and one-half years after the victim confronted the defendant about the false letters and demanded repayment. See *State* v. *Pulley*, 46 Conn. App. 414, 418, 699 A.2d 1042 (1997) ("[t]he conduct of the defendant subsequent to [receipt of money from victim] may be taken into consideration by the jury in determining [whether] the defendant had the intent to steal when he received the money from victim"). The jury, therefore, reasonably could have found, on the basis of the defendant's pattern of deceitful conduct and the defendant's lack of effort to repay the victim within three and one-half years, that the defendant intended to deprive the victim of his property permanently.

The defendant further argues, however, that the record indicates that he would repay the victim once the business was successful and profitable. To support

his claim, the defendant relies on e-mail communications from the victim to the defendant and on the victim's testimony. Although the evidence indicates that the victim supported the defendant's efforts to make the business successful, these encouraging statements do not indicate that the defendant intended to repay the money. See *State* v. *Vars*, 154 Conn. 255, 261, 224 A.2d 744 (1966) ("the offense is larceny if the owner of goods parts with the possession only, for a particular purpose, and the person who receives the possession avowedly for that purpose has a fraudulent intention to make use of it as the means of converting the goods to his own use, and does so convert them, for in such case the fraud supplies the place of the trespass in the taking" [internal quotation marks omitted]). Rather, the statements indicate only that the victim fell prey to the defendant's deception. The jury reasonably could have found that the defendant's empty promises to the victim were further circumstantial evidence supporting the conclusion that the defendant did not intend to repay the victim.[10]

We conclude that the evidence, viewed in its entirety, suggests that a jury reasonably could have found that the defendant intended to deprive the victim of $50,100 permanently.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The $34,000 investment was distinct from the subsequent $50,100 loaned to the defendant. The investment was not the basis for the larceny and is not at issue in this appeal.

[2] It was further determined that Hynes was an employee of Barclays Bank, but that the position of Premier Operations Director of International Affairs ascribed to Hynes in the letters did not exist.

[3] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[4] General Statutes § 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds twenty thousand dollars . . . ."

We note that when the defendant began to engage in the conduct that led to his conviction, the threshold for larceny in the first degree was $10,000. Public Acts 2009, No. 09-138, § 1 (a) increased the threshold to $20,000. This statutory change is not at issue in this appeal.

[5] On May 14, 2012, the defendant filed a motion to dismiss the count of forgery in the third degree on the ground that the statute of limitations had passed. The court granted the motion to dismiss.

[6] General Statutes § 53a-119 (2) provides in relevant part: "A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person."

[7] General Statutes § 53a-119 (3) provides in relevant part: "A person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property of another by means of a representation, express or implied, that he . . . will in the future engage in particular conduct, and when he does not intend to engage in such conduct . . . ."

[8] The defendant does not contest that the jury reasonably could have found that the state met its burden as to the first and third elements of larceny.

[9] With regard to the Barclays Bank account, the victim testified that the defendant told him that, before he moved to Connecticut, he owned a clothing store in London. The store had cash only sales on Saturdays, and

he accumulated over $1.2 million, which he deposited in a Barclays Bank account. The defendant, however, had forgotten about the money until he found old bank statements in the attic of his Connecticut home. Moreover, due to back dated taxes, the funds were temporarily unavailable. Actually, the defendant opened an account at Barclays Bank but never made any deposits, and the account had a negative balance because of monthly maintenance fees being charged.

[10] The state also argues, as an alternative ground for affirmance, that the element of intent can be met by an unchallenged theory of intent to appropriate pursuant to § 53a-118 (a) (4), which does not require permanency. In light of our conclusion that the jury reasonably could have found the defendant had the requisite intent to deprive the victim of his property permanently, we need not address this alternative ground for affirmance.

_____